UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIA QUINONES,

    Plaintiff,

v.                            Case No:

CITY OF SARASOTA, FLORIDA,

    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, Maria Quinones, by and through her undersigned counsel, and, by way of this Complaint, seeks relief against Defendant City of Sarasota, Florida, pursuant to Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq.*, as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Maria Quinones ("Plaintiff" or "Ms. Quinones") is a female citizen of the United States and the State of Florida who is also a Lesbian. At all times relevant herein, Plaintiff worked for Defendant City of Sarasota ("Defendant" or "Police Department") in the City of Sarasota, Florida as a Police Officer, and was a resident of the State of Florida.

2. Defendant's Police Department is a department within the City of Sarasota, Florida, a public agency, with its principal office in the City of Sarasota, Florida.

3. Defendant is, and has been, a covered employer within the meaning of 42 U.S.C. § 2000e(b, h).

4. Plaintiff was a covered employee of Defendant within the meaning of 42 U.S.C. § 2000e(f) at all times relevant herein.

5. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

6. All acts complained of herein occurred in Sarasota County, Florida. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

7. Plaintiff was hired by Defendant on or about December 13, 2023 as a police officer. Plaintiff worked in that capacity until she was forced to resign by Defendant on or about April 7, 2025.

8. During her employment with Defendant, Plaintiff performed her duties as a police officer in a competent manner. Plaintiff passed all training and was awarded a Lifesaving Medal.

9. During her tenure with Defendant, Plaintiff suffered discrimination, harassment, and retaliation based on her sex and sexual orientation, and protected activity.

10. During Plaintiff's training, in approximately late Spring 2024, another police officer, Michael Bender, made discriminatory comments in front of Plaintiff as well as other officers in the workplace. Mr. Bender was aware of Plaintiff's sexual orientation and told Plaintiff and another lesbian officer that they should go "scissor" each other in the locker room, and that they should open a café called "Scissors." These comments were offensive to Plaintiff, inappropriate in the workplace and sexual in nature. Mr. Bender also made discriminatory comments on account of race in front of Plaintiff as well as other officers regarding the "Juneteenth" holiday, directed at an African American officer. Additionally, Mr. Bender made disparaging and discriminatory comments about the body of a female civilian employee's in front of Plaintiff as well as other officers. Mr. Bender engaged in making discriminatory and offensive comments in front of Plaintiff and other officers over a period of weeks.

11. To address the discriminatory and offensive comments by Mr. Bender, Plaintiff spoke to him on several occasions to ask him to stop making such comments.

12. Because Mr. Bender continued making offensive and discriminatory comments in the workplace and management of Defendant failed to prevent such comments, Plaintiff reported the offensive and discriminatory comments by Mr.

Bender to the Internal Affairs Department of the Sarasota Police Department ("IA") in June 2024.

13. In addition to making a complaint to IA, Plaintiff also discussed the discriminatory treatment by Mr. Bender she was experiencing with her training officers, including Sgt. Dan Weinsberg, Officer Maszek, and Officer Nicholas Dominis. Sgt. Weinsberg told Plaintiff that he would take her complaints to Lt. Miller, who was both the head of training and part of IA.

14. On or about June 20, 2024, IA began an investigation of Mr. Bender as a result of Plaintiff's complaint of the offensive and discriminatory comments by him. As a result of the investigation, Mr. Bender was removed from the Police Department with the Defendant apparently allowing him to resign.

15. In or about July 2024, Plaintiff went into the workplace locker room after a training session to change clothing. Another female officer, who is a lesbian, was in the locker room at the time, as was Officer Dominika (female). Officer Dominika then announced in front of Plaintiff and to other officers in the room that she was leaving the locker room because she didn't need to stay there because she is not gay.

16. News of Plaintiff's complaint to IA regarding Mr. Bender's offensive and discriminatory behavior spread through the Defendant's Police Department. Once Plaintiff started patrol officer duties, Plaintiff was assigned a Field Training Officer by Defendant to accompany Plaintiff on patrol duties from approximately November

2024 through January 2025. All four (4) of Plaintiff's Field Training Officers, who were each male, commented to Plaintiff that they had heard about her complaint to IA regarding Mr. Bender. The Field Training Officers told Plaintiff that they knew Mr. Bender had made jokes about Plaintiff being a Lesbian and that Plaintiff had reported Mr. Bender for his discriminatory comments and jokes.

17. Plaintiff also began to experience additional discriminatory and offensive comments about her from other officers. For example, Plaintiff was called a "snitch" on several occasions, with one officer stating that he wondered if he would be the next person Plaintiff would report to IA and get fired.

18. The reaction by officers and supervisors to Plaintiff's report of Mr. Bender's discriminatory and offensive comments to IA was intimidating to Plaintiff as she knew she would have to rely on fellow officers in the line of duty as a patrol officer for Defendant.

19. In November 2024, Plaintiff entered the second phase of her training with Defendant and was told by a training officer, Officer Colon, that she should not be surprised if he sent her for remedial training. While Office Colon, male, claimed he sent everyone to remedial training, he sent only Plaintiff and one other female officer to remedial training from their group. On knowledge and belief, no male officers from the group were sent for remedial training and the remedial training of Plaintiff was done as a discriminatory and retaliatory measure.

20. Upon finishing Phase 4 training in January 2025, during a small celebration involving officers and supervisors, Officer Dominika (female) made a discriminatory comment about Plaintiff's sexual orientation in front of Plaintiff and other officers as well as supervisors, stating that Plaintiff would not have a problem with having kids because she was "gay." Shortly thereafter, two other officers, Officer Dougan (female) and Officer Vella (Male), asked for confirmation from Plaintiff that Plaintiff was "gay." This took place in from of a group of officers, including supervisors and was offensive and humiliating to Plaintiff.

21. Supervisors, Sgt. Terris and Lt. Combs, were also present at the gathering set forth in paragraph 20 herein, and were able to hear the comments made regarding Plaintiff, yet they took no action at any time to report or discipline any of the officers making the offensive comments. Instead, these supervisors simply stared at Plaintiff when the offensive and discriminatory comments were made.

22. Following Plaintiff's complaint to IA about Mr. Bender and being subject to offensive and discriminatory comments in the workplace, on or about February 4, 2025, Plaintiff received a reprimand from Defendant for allegedly not properly verifying a warrant. However, Plaintiff had properly verified the warrant as demonstrated by a radio record. Defendant did not provide any explanation or an apology for the incorrect reprimand, or even an acknowledgement that she had acted correctly, and that the reprimand was in error.

23. On or about February 12, 2025, Plaintiff was advised by Sgt. Rosenagle, male, to add information to a report regarding a vehicle stopped for a headlight violation. Rather than issuing a warning, Plaintiff had filled out a Case Report and submitted it to Sgt. Rosenagle. Sgt. Rosenagle then returned the Case Report to Plaintiff, instructing her to add information to the report. The instruction by Sgt. Rosenagle appeared by Plaintiff under the circumstances to be unnecessary and for discriminatory and retaliatory reasons.

24. The following day, February 13, 2025, Plaintiff was singled out for extra scrutiny by Sgt. Stoll, male, and Sgt. Terris, male. Plaintiff met with Sgt. Stoll and Sgt. Terris, at their request, regarding her body worn camera footage from several days' period of time. During this meeting, Plaintiff asked if it was standard procedure to review body worn camera footage when there had been no complaint or incident. Plaintiff was told by it was standard procedure, but Plaintiff later learned it was not standard procedure unless an investigation was ongoing. Sgt. Stoll and Sgt. Terris then criticized Plaintiff's demeanor in the video, stating that she appeared "scared and timid." They then questioned whether Plaintiff wanted to even be a police officer. However, this criticism was inaccurate as Plaintiff did not show any indication that she was scared or timid. Instead, these comments were made with discriminatory and retaliatory intent.

25. On or about March 18, 2025, Plaintiff was awarded a Lifesaving

Medal by Defendant. The Defendant's Police Chief on that date told Plaintiff she was doing a "great job." However, after Plaintiff received the award, Sgt. Stoll made a comment in front of Plaintiff and other officers in a demeaning manner that the Defendant was giving Lifesaving Awards "for anything nowadays."

26. On or about March 23, 2025, Sgt. Stoll sent Plaintiff for remedial training. When Plaintiff questioned the need for this additional training with other supervisors, the other supervisors told Plaintiff that they did not know why such training was ordered by Sgt. Stoll as Plaintiff was successfully passing all training objectives.

27. Thereafter, Plaintiff reported for additional training as ordered by Sgt. Stoll. The training officer was Officer Bernier. Plaintiff then discussed with Officer Bernier the alleged need for more training. Officer Bernier told Plaintiff that she was sent for the additional training because she had in the past reported Mr. Bender to IA.

28. On or about April 1, 2025, Plaintiff met with Lt. Shellhammer who told Plaintiff that Officer Bernier had only good things to say about her performance. Plaintiff then asked Lt. Shellhammer if the additional training and scrutiny meant she was going to be fired. Lt. Shellhammer replied, "You're not going to be fired."

29. During a shift briefing in Police Department Headquarters on April 1,

2025, all shift officers gathered, including Sgt. Stoll, Plaintiff's supervisor at the time. At the briefing Officer Dominka and Sgt. Stoll joked about "dildos" in front of the whole group, while looking at Plaintiff and laughed. Plaintiff was not laughing and had an offended expression on her face. Others in the room looked at Plaintiff and laughed as well. This offensive and discriminatory behavior at the shift briefing was directed at Plaintiff, due to her sex and sexual orientation.

30. On April 4, 2025, Plaintiff received a call from Sgt. Stoll two hours before her shift telling her that she was being placed on Administrative Leave. Plaintiff was not given any reason for the Administrative Leave. Plaintiff was then told by Sgt. Stoll to report to the training officer the following Monday.

31. Plaintiff contacted Union President Eric Urbain to see if the Union could get an explanation for the Administrative Leave. Urbain eventually told Plaintiff that he could not get an answer from Defendant other than simply that Plaintiff was on Administrative Leave until Monday. Urbain then told Plaintiff that if they didn't take her patrol car and gun it was most likely not a termination.

32. On Monday, April 7, 2025, Plaintiff reported to the training officer as she had been ordered to do by Sgt. Stoll. Sgt. Weinsberg, the trainer, was not expecting Plaintiff and told Plaintiff that he did not know why she had been on Administrative Leave. Sgt. Weinsberg called Sgt. Stoll who said Plaintiff had been placed on "Administrative Time", not Administrative Leave.

33. Thereafter, Sgt. Weinsberg told Plaintiff to return at 1 p.m. to meet with Lt. George Miller, from Internal Affairs, who was also head of the training department.

34. Upon returning at 1 p.m. as ordered, Plaintiff found not only Lt. Miller present, but also Captain Rainey. Captain Rainey told Plaintiff that she had only two choices, to resign or to be involuntarily terminated.

35. Plaintiff then requested a Union representative to be present for the meeting, but her request was denied by Lt. Miller and Captain Rainey. The Union was never informed that Plaintiff had asked for a representative. By contrast, a male officer who had recently run over a child was granted Union representation and was retained by the Defendant.

36. During the meeting April 7, 2025, Captain Rainey told Plaintiff that he had never seen anyone get fired in Phase 5 of the training and that he did not understand why Plaintiff was being terminated by Defendant, other than some vague, undefined safety reasons. Captain Rainey then suggested that Plaintiff apply to be a police officer with the Bradenton Police Department.

37. At the time of Plaintiff's forced departure from Defendant, other officers were given chances for additional training and chances to remediate any deficiencies. Plaintiff asked for the same but was denied the opportunity.

38. During Plaintiff's time employed with the Defendant, Plaintiff observed

that three (3) other female officers were terminated or forced to resign.

39. During her time employed with Defendant, Plaintiff observed that numerous female officers, even officers who had attained full officer status and were no longer trainees, were frequently placed in remediation. This was not true of male officers.

40. Plaintiff timely files this lawsuit after having timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission for the claims set forth herein and within 90 days of receiving a Notice of Right to Sue from the EEOC.

41. All administrative prerequisites, if any, have been met for each claim brought in this Complaint, and each such claim is timely brought.

## COUNT I
### (Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e §§ *et seq*. – Sex/Sexual Orientation Discrimination)

42. Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-41 above as though set forth fully herein.

43. During Plaintiff's employment, Defendant, by and through its agents, officials and/or employees, unlawfully discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, by allowing offensive and discriminatory comments based on Plaintiff's sex/sexual orientation in the workplace, by assigning Plaintiff to remedial training because of her sex/sexual

orientation, and by denying Plaintiff training and opportunities that were afforded to male officers.

44. Ultimately, Defendant forced Plaintiff from her position involuntarily on account of her sex/sexual orientation by terminating her employment, with the choice of either resigning or being fired.

45. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish and embarrassment, justifying an award including, but not limited to, back, pay, lost benefits, front pay, and compensatory damages against Defendant.

## COUNT II
### (Violation of 42 U.S.C. § 2000e-3(a) – Retaliation)

46. Plaintiff incorporates by reference herein and realleges the allegations in Paragraphs 1-41 above as though set forth fully herein.

47. Plaintiff engaged in protected activity by objecting to discrimination in Defendant's workplace, including complaints to Defendant's supervisors and Internal Affairs Department regarding Mr. Bender. At all times relevant herein, Plaintiff held a reasonable, good faith belief that her treatment in the workplace by Defendant was discriminatory conduct on account of her sex and sexual orientation as well as that the treatment of other officers was discriminatory, and reported that treatment in good faith to Defendant.

48. After Plaintiff engaged in protected activity, specifically reporting offensive and discriminatory behavior in the Defendant's workplace, and because of her engagement in that activity, Defendant took adverse action against Plaintiff in violation of Title VII by, *inter alia*, allowing discriminatory and offensive comments to continue, assigning Plaintiff to remedial training, despite Plaintiff successfully completing all training assignments and examinations, critiquing and micromanaging Plaintiff's actions in a manner that supervisory officers admitted was not standard operating procedure, placing Plaintiff on Administrative Leave without explanation, denying Plaintiff Union representation, and forcing Plaintiff out of her position by terminating her employment, with the choice of either resigning or being fired.

49. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish and embarrassment, justifying an award including, but not limited to, back, pay, lost benefits, front pay, and compensatory damages against Defendant.

**WHEREFORE,** Plaintiff Maria Quinones respectfully requests that this Honorable Court grant the following relief:

(a) Enter judgment on behalf of Plaintiff and against Defendant on all Counts herein;

(b) Award Plaintiff back pay, front pay, including lost benefits, as provided for under Title VII;

(c) Award Plaintiff compensatory damages as provided for under Title VII in an amount to be determined by the jury;

(d) Order Defendant to reinstate Plaintiff and other declaratory relief;

(e) Award Plaintiff reasonable attorneys' fees, costs, expenses, pre-judgment interest, and post-judgment interest; and

(f) Such other or further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 27, 2026              Respectfully submitted,

/s/ Neil L. Henrichsen
Neil L. Henrichsen
Florida Bar No.: 0111503
HENRICHSEN LAW GROUP PLLC
301 w. Bay St., 14th Floor
Jacksonville, Florida 32202
Phone: (904) 381-8183
Fax: (904) 212-2800
nhenrichsen@hslawyers.com
service@hslawyers.com
**Lead Counsel for Plaintiff**